WILLIAM R. ROTTERMAN et al., appellants, v. GENERAL MILLS, INC., appellee.

No. 48396.

(Reported in 61 N.W.2d 718)

230

DECEMBER 15, 1953.

McMahon & Cassell, of Algona, and Kelleher & Kelleher, of Fort Dodge, for appellants.

Breese & Cornwell, of Mason City, for appellee.

LARSON, J.—This is an action in equity demanding judgment for the value of 1002 bushels of soybeans alleged to have been converted by the defendant, General Mills, Incorporated, at its Belmond, Iowa, plant. The plaintiffs, under an oral arrangement with the Garry Grain Company, of Ledyard, Iowa, had delivered some 105 acres of soybeans to the Garry Grain Company in the months of September, October and November, 1948, and three of the loads had been trucked direct from the farm to the defendant's mills at Belmond. The main issue in the case is whether the original transaction between the plaintiffs and the grain company was a sale or a bailment. The defendant had purchased the beans from the grain company and had made payment therefor and, as a further defense, alleged that plaintiffs, by their conduct, were estopped from denying that the Garry Grain Company did not have authority to sell the beans. The trial court

held for the defendant on the grounds that the transaction was a sale, and that plaintiffs were estopped to deny the grain company's right to sell the beans to defendant.

The plaintiff William R. Rotterman testified that he asked the owner of the Garry Grain Company, Tom Garry, sometime in the 1920's if he could "take my grain and store it in there when I had the time and could haul it, and sell it when I got ready", and that under such arrangement he delivered grain to the grain company as long as Tom Garry was operating it; that in 1940 Larry Walsh became the manager of the grain company and that he agreed to continue the arrangement. This plaintiff testified further that Mr. Walsh agreed to do that on each occasion, and at a later date he would go in and sell that grain, and the date depended on two things: on the market, and sometimes he had to have some money to operate on. He was paid the market price for the grain on the particular day that he sold it. On these particular beans, he "asked him [Walsh] if he could take care of them the same as we had in the past, and he said he would."

■ I. This is another of the well-known and greatly discussed grain-deposit cases, and while support for almost any view can be found, the Iowa courts tend to follow the sound general rule that *in the absence of a contrary intention*, where a depositor is not to receive back the identical grain, but either money or like quality of grain, the transaction is a sale, not a bailment. Barnes Bros. v. McCrea & Co., 75 Iowa 267, 39 N.W. 392, 9 Am. St. Rep. 473; State v. Folger, 204 Iowa 1296, 210 N.W. 580; Bayliss v. Davis, 47 Iowa 340; Kansas Flour Mills Co. v. Board of Comrs., 124 Kan. 312, 259 P. 795, 54 A. L. R. 1164; Savage v. Salem Mills Co., 48 Ore. 1, 85 P. 69, 10 Ann. Cas. 1065; Cloke v. Shafroth, 137 Ill. 393, 27 N.E. 702, 31 Am. St. Rep. 375; Finch v. McClellan, 77 Ind. App. 533, 130 N.E. 13, 131 N.E. 236; 14 Iowa L. Rev. 238.

We said in Barnes Bros. v. McCrea & Co., supra, at pages 268, 269 of 75 Iowa, page 393 of 39 N.W., one of our earliest cases on this subject: "The appellants claim that their oats were delivered under a verbal agreement that they were to stay in the elevator until plaintiffs were ready to sell them. * * * The statements of plaintiffs * * * must be taken and construed in connection with admitted and known facts."

 We held in Rhynas v. Keck, 179 Iowa 422, 161 N.W. 486, that where nothing other than payment upon weighing and a physical change of location was left to be done, there was a sale.

 On the other hand it is undoubtedly the rule that if, by the terms of the contract, the consignor or owner of the property retains a right to demand a return thereof at any time, without default on the part of the person to whom it is delivered, the transaction is to be held one of bailment or agency, and not a sale. In re Flanders, 7 Cir., Ill., 134 F. 560, 67 C. C. A. 484.

 The question of whether the title to personal property, which is the subject of contract, has passed to the vendee under an agreement, is one of intent. If there has been an actual delivery and nothing further remains to be done by either party to determine the price, quality or weight of the grain, the strong presumption is that the intention was to pass title. First National Bank of Ottumwa v. Reno, 73 Iowa 145, 34 N.W. 796; Latta v. Menching, 186 Iowa 975, 173 N.W. 229. It is sufficient if the price is always definite or capable of being made definite. Sempel v. Northern Hardwood Lbr. Co., 142 Iowa 586, 121 N.W. 23; Burke v. Boulder Milling & Elevator Co., 77 Colo. 230, 235 P. 574.

 It is also true that as long as the identical grain, or a quantity of like grain is kept on hand by the consignee, there is a fair presumption that the transaction was a bailment. Backus v. Lawbaugh, Iowa, 86 N.W. 298; Ledyard v. Hibbard, 48 Mich. 421, 12 N.W. 637, 42 Am. Rep. 474. Of course where there is no conflict in the evidence and the terms of the agreement are admitted, the intent becomes a question of law for the court. Rudy-Patrick Seed Co. v. Roseman, 234 Iowa 597, 13 N.W.2d 347; Sempel v. Northern Hardwood Lbr. Co., supra; Moats v. Strange Bros. Hide Co., 185 Iowa 356, 170 N.W. 456. For the common-law rule, see 67 C. J., page 457.

 II. Plaintiffs do not deny these statements of the law, but argue strongly that the trial court erred in failing to find that the intention of the plaintiffs and the Garry Grain Company, as expressed by the testimony of the plaintiffs, clearly and unambiguously disclosed that plaintiffs retained title to the soybeans delivered and that the transaction was a bailment, not a sale.

But was the testimony so clear and unambiguous, and was it undisputed by other evidence?

During the testimony one of the plaintiffs stated that he had originally asked the officer of the Garry Grain Company if he would "take my grain and store it in there when I had the time, and could haul it, and sell it when I got ready." Another time the plaintiff asked an officer of the grain company if he could "take that grain and keep it there until I got ready to sell it * * *." At still another time he testified, "Mr. Walsh told me he could hold those beans for me." It must be noted that under the Iowa grain-deposit decisions these words are not inconsistent with a sale. While no one testified for the Garry Grain Company, the "Settlement Books" of that company were introduced in evidence showing entries from September 17, 1948, until November 29, 1948, the period involved herein, as follows: "Bought of Rotterman, Kind of Grain, Soybeans", and listing therein three truckloads of beans delivered to Belmond by one Otto Engelbarts, a neighbor of the plaintiffs. While the words "store", "keep" and "hold", as used, indicate an intention on the part of the plaintiffs to create a bailment, the term "bought" as used by the Garry Grain Company indicates an intention on its part to be indebted therefor and is creative of a sale. An agreement should be interpreted as a whole and the meaning gathered from the entire context and not from particular words, phrases, or clauses; in fact, the entire agreement should be considered to determine the meaning of each part. Stout v. Folger, 34 Iowa 71, 11 Am. Rep. 138; 12 Am. Jur., Contracts, section 241, page 772. We are unprepared to say, therefore, that these words do not need interpretation or construction, and believe the trial court was correct in considering in this connection the past practices, the actions of the parties, and other surrounding circumstances in arriving at the objective or actual intention of the parties.

We said in Norwegian Plow Co. v. Clark, 102 Iowa 31, 37, 70 N.W. 808, 810: "One of the principal tests by which to determine this question is, was there a binding promise on the part of the consignee to pay for the goods? If there was such promise, the contract is ordinarily held to be one of sale, and not of bail-

ment." Also see Bentley & Olmstead v. Snyder & Son, 101 Iowa 1, 69 N.W. 1023.

We think the grain company's books show they considered such a promise had been made. It is true, as plaintiffs contend, that in Hughes v. Stanley, 45 Iowa 622, we held that a receipt of a warehouseman for grain received by him may be evidence indicating that the transaction is a sale, yet it will not be received to defeat the conditions of an oral agreement between the parties. In that case, however, the circumstances showed that the grain had been retained in storage and was destroyed by fire.

It was for the court to decide whether, by the terms of the agreement and the surrounding circumstances, it was the intention (1) to permit the option to sell, or demand a return of the soybeans or a like quality and quantity of beans, in the plaintiffs, or (2) to permit the option to pay for the beans at the market price when demanded by plaintiffs or return the soybeans or a like quality and quantity of beans, in the Garry Grain Company. If it was the consignor's option, there was a bailment, and if the consignee's option, the transaction was a sale. Under the Iowa rule as heretofore pointed out, the latter is presumed under facts as appear herein unless a contrary intention is shown, and this was plaintiffs' burden. There is no question as to the delivery of the soybeans to the Garry Grain Company in the fall of 1948 and that they were properly weighed and graded. The beans were sent direct from plaintiffs' farm to the defendant's mill, where they were weighed, and plaintiffs were shown those weight slips, which reasonably indicated, we think, the fact that the beans were being sold to the defendant by the Garry Grain Company. This was also a circumstance helpful in determining intent for it disclosed, or should have disclosed, to plaintiffs the interpretation placed upon the agreement by the Garry Grain Company.

We said in Cownie v. Local Board of Review, 235 Iowa 318, 326, 16 N.W.2d 592, 596: "Whether a sale was made, and whether and when the title passed, and whether the sale was executed or executory, are questions of intent, depending for their determination upon the wording of the contract, whether written or oral, and upon the conduct of the parties, and the surrounding circum-

stances", citing Bishop v. Starrett, 201 Iowa 493, 495, 207 N.W. 561; Allen v. Elmore, 121 Iowa 241–244, 96 N.W. 769; Welch v. Spies, 103 Iowa 389, 391–393, 72 N.W. 548; Thompson v. Frakes, 112 Iowa 585, 588, 84 N.W. 703, and others.

This custom and rule has been incorporated in the statutes of Iowa. Section 554.19, Code of 1950, relating to the Iowa Uniform Sales Act, states:

"1. Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"2. For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case."

The undenied testimony as to former transactions was that, after the delivery of grain under such arrangements, the plaintiffs would demand settlement for the grain whenever they needed money to operate on, or whenever they considered the market satisfactory. Sometimes, as in this case, this demand for final settlement was not made for nearly a year. The plaintiff Frank Rotterman testified that late in August he visited the Garry Grain Company's plant and told Mr. Walsh "I wanted that *money* in September, and he said he would have it for me." (Italics ours) Soon thereafter the grain company closed its doors, and its owner started proceedings in bankruptcy. Prior to that, in April 1949, the plaintiffs took an offset to settle a bill of $1433 for fertilizer obtained from the Garry Grain Company. Plaintiff testified, "He wiped that clean for that amount of beans * * * I had in there." The settlement figure for those beans was the market price of $2.24 per bushel on that day.

No storage was ever charged or paid to the Garry Grain Company over the years, and no mention was made of storage charges in the alleged agreement. It seems inconceivable that a reasonable person could expect to store grain indefinitely without a storage charge if the transaction was, in fact, a bailment. One of the plaintiffs testified, in reply to the question as to who was to pay the storage if there was storage charged at Belmond

on the beans so delivered, that Walsh would take care of that "In the settlement of our beans." Thus it would appear that even the plaintiffs found it hard to justify, in reason, free storage under the bailment theory.

We think these are important indications that the parties intended that the only thing left to be done in this transaction was the payment for the beans at the market price on the date demanded by the plaintiffs, which created a strong presumption of an immediate sale at the time of the delivery. Rhynas v. Keck, supra.

■ There are also these further circumstances tending to confirm this conclusion. Plaintiffs carried no insurance upon grain delivered to the grain company under these arrangements. There was no evidence of the plaintiffs' ever demanding a return of their grain or a like quality or quantity over the period of time of dealings of some twenty years with the Garry Grain Company, nor was there ever a sale to another of any of such delivered grain. Over the years no instance was related to indicate any interest or concern as to what was done with the grain delivered to the Garry Grain Company, or where the delivered grain was being stored. There was no material evidence that plaintiffs exercised any substantial rights of ownership, with the possible exception of a statement on cross-examination that the beans were listed for taxation in January 1949, and then the quantity listed was unknown. There was no warehouse receipt issued for these beans. Only a simple memorandum as to the amount and type of grain was delivered to the plaintiffs. No substantial evidence appears of acts or circumstances that support plaintiffs' contention that when the grain was delivered to the elevator, the intention of the parties was to effect a bailment or was indicative of a contrary intention to effecting a sale. While it is true many of these acts and circumstances are not conclusive or necessarily inconsistent with a bailment, yet they may be considered here as enlightening circumstances in the determination of intent not otherwise clear and certain. The court must take an objective view in determining the parties' intent. It is not necessarily the actual intent we seek, but the intent manifested objectively. Union Republican Co. v. Anderson, 211 Iowa 1, 5,

232 N.W. 492; Comptograph Co. v. Burroughs Adding Machine Co., 179 Iowa 83, 159 N.W. 465; Seeger v. Manifold, 210 Iowa 683, 231 N.W. 479. We seek the intent a reasonably intelligent person would derive from the expressions used, under the circumstances and knowledge of the parties at the time of the transaction. Iowa annotations to Restatement of Contracts, section 227, page 352; 1 Williston on Contracts, Rev. Ed., section 35; 12 Am. Jur., Contracts, section 227, page 748.

The trial court, we think, properly considered all these factors in finding that the intention of the parties was to transfer title in the beans from the plaintiffs to the Garry Grain Company on delivery, and that the grain company was indebted to plaintiffs therefor at that time, with only the amount to be determined by the market price on the date selected by plaintiffs. The intention of the parties would appear to be an arrangement by which the plaintiffs could get their grain from the farm to the market without having to sell for the market price at the time of delivery, which time usually brings a low price due to the present harvest, and thereby secure the benefits of higher prices. It might be said that both the plaintiffs and the grain company were playing the board of trade.

We are content with this construction of the agreement. We believe it clear that most of the circumstances favor the construction placed upon the agreement by the trial court. As the transactions in the past had always ended in a remittance to plaintiffs for their grain, we also think they had no intention to retain title or exercise further control of that grain. Even in the bankruptcy proceedings the claims filed were not for beans, but for their value. They knew their beans were trucked to Belmond seventy-one miles away, but made no inquiry as to why they were sent that far away, nor did they show concern over their disposition, claiming, however, they believed they were to be stored at Belmond. The grading slips disclosed, however, they were delivered to General Mills, Inc., who did no storing for others, and only purchased grain from elevators, not from farmers. It was only reasonable to believe from the scale tickets that these beans were sold by the Garry Grain Company to the defendant, General Mills, Incorporated, at Belmond.

Having decided that the intention of the parties was to make

a present sale with payment deferred, with no option in plaintiffs to demand a return of beans, and that a contrary intent was not shown, the case falls squarely within the general Iowa rule that in such circumstances the transaction is a sale and not a bailment. As the Garry Grain Company had title when the beans were sold to the defendants, it follows that the defendants obtained good title and there was no conversion of plaintiffs' property. Barnes Bros. v. McCrea & Co., supra. Here, also, we of necessity have found that the option, if there was an option, was with the grain company, and we must therefore agree with the trial court in its construction of the contract.

III. The trial court also found that if the Garry Grain Company did not have title to the beans when they were sold and delivered to the defendants, by their acts and conduct the plaintiffs were estopped to maintain now that the grain company had no right to sell the beans to the defendant, and we agree.

Section 554.24, Code of Iowa, 1950, provides: "1. Subject to the provisions of this chapter, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority * * *."

We believe the facts already related herein placed upon plaintiffs a duty to act, in order to prevent loss to the defendant who was an innocent party and quite unaware of plaintiffs' claim to the beans in question. These facts are sufficient to create an estoppel and preclude plaintiffs from denying the Garry Grain Company's authority to sell the beans to defendant. Furst-McNess Co. v. Kielly, 233 Iowa 77, 8 N.W.2d 730; Hart v. Worthington, 238 Iowa 1205, 30 N.W.2d 306; Crescent Chevrolet Co. v. Lewis, 230 Iowa 1074, 300 N.W. 260; Phelps v. Linnan, 174 Iowa 138, 156 N.W. 294. This would be true, however, only as to the three truckloads hauled direct from plaintiffs' farm. In view of our holding on the main issue it is unnecessary to consider this point further or to consider the contention by defendant that the soybeans in question were not properly identified.

240

The judgment of the trial court must therefore be affirmed. —Affirmed.

All JUSTICES concur.